## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:21-00017 (WOB-CJS)


F. MICHAEL CREUSERE, II,

                                          PLAINTIFF,


VS.                    MEMORANDUM OPINION AND ORDER


MATTHEW BAKER,
ET AL.

                                          DEFENDANTS.


In this employment discrimination case, Michael Creusere is suing the Walton-Verona school district, school administrators, and a school counselor for discrimination, hostile work environment, retaliation, and defamation. (Doc. 1-1 ¶¶ 43-44, 48-49).

Before the Court is Defendants' Motion for Summary Judgment. (Doc. 75). Creusere filed a Response, (Doc. 99), and Defendants filed a Reply (Doc. 100). For the following reasons, Defendants' motion will be granted.

### *Factual and Procedural Background*

Michael Creusere is a 77-year-old man. (Doc. 73 at 9). He can't walk or stand for too long because of a spine injury from a truck accident in 2007. (*Id.* at 94-95). He uses a cane to walk. (*Id.* at 94). He is also a Type-2 diabetic and has sleep apnea. (*Id.* at 96).

From 2012 through 2019, Creusere was a substitute teacher with the Walton-Verona Independent School District. (Doc. 82-11; Doc. 77 at 48-49). In November 2019, following a series of incidents that unfolded over the course of about a week, the school district superintendent, Matthew Baker, fired him. (Doc. 77 at 48-49).

First, on November 1, a counselor at Walton-Verona Middle School allegedly overheard Creusere "joking" with a seventh grade student about the student being Creusere's "girlfriend" when she turned 18. (Doc. 91 at 19-21). The counselor emailed the school principal and district superintendent to tell them what she had overheard. (Doc. 75-1). She said she "felt uncomfortable and thought the joking was very unprofessional." (*Id.*).

Later, Creusere gave his own version of the event:

It wasn't that. What occurred was, first of all, there were four girls, not one. And the girls asked me which one did I think boys would like the best. And I said I wouldn't know, because I haven't dated anyone under the 18 since high school. . . . They didn't ask me about dating. I didn't ask about that.

(Doc. 73 at 112).

Second, on November 4, Creusere brought a homemade poster into the classroom he was working in that day. (*Id.* at 122). Here is that poster:

Welcome to Kids on the Barbee Restaurant



We select only premium bad children for our menu sandwiches, and guarantee an eating feast.

*********************************************

Children ages 0-6, tender, fresh with our special BBQ sauce to delight your taste buds.

Children ages 7-12, prime, delightful cuisine that is sure to please your appetite.

Children ages 13-19, gnarly, hard to handle so we marinate for 48 hours to insure tenderness.

We accept all donations for our unique menu.

The poster had been hanging on the door of his apartment along with some Halloween decorations. (*Id.* at 153). As he left the apartment that morning, he noticed it flapping in the breeze, so he took it off the apartment door and stuffed it into his briefcase. (*Id.*).

At school that day, Creusere showed the poster to some of the students in his class. (*Id.*). Eventually, word of the poster (and the poster itself) made its way to the school principal, Eric Morwessel, who told the district superintendent that the poster had been hanging on a board in Creusere's classroom. (Doc. 80 at 124-25; Doc. 75-2). Creusere maintained that the poster was never hanging on the board but was instead sitting on his desk. (Doc. 73 at 153).

Creusere said the poster was a Halloween-themed "parody." (*Id.* at 122). He also said that the assignment he was supposed to give to the students that day, per the instructions of the teacher for whom he was a substitute, also involved a parody. (*Id.* at 133). That assignment was to watch an animated Disney children's movie called *Nightmare Before Christmas*, and to answer questions about narrative techniques, empathy, characterization, and setting. (Doc. 75-8). Here is what that assignment looked like:

## Characters
Identifying and researching creepy characters



Draw lines to join the characters' image to their name. Highlight or underline the names of the HERO and the VILLAIN.

Dr Finkelstein

Oogie Boogie

Lock Shock and Barrel

Jack Skellington

Sally

Mayor

**Pick one character and complete this fact file:**

Name:.....................

How does he/she look? (describe their appearance):
.....................
.....................

How does he/she scare people?:.....................
.....................

Is she/he involved with any other characters? Who and how?:.....................
.....................

2.

---

## Narrative
Interpreting film narrative.

Unscramble this: alwoehlen notw
What is it the name of?.....................

**The Opening:**

Jack is the ............. of ................. ............. He is thought to be the ..................... thing in the world. In the opening section of the story, Jack begins to wonder if there is more to ...... than ............... people. Meanwhile, Sally loves Jack from afar, but is held captive by her evil ...................

Halloween town    creator    life    ruler
scaring    scariest

1. How does Jack react when he sees Christmas Town?.....................
.....................

2. What does he decide he wants to do after seeing it?.....................
.....................

3. What plan does he hatch to achieve his aim?.....................
.....................

4. What goes wrong?.....................
.....................
.....................

3.

---

## Empathizing
Empathizing with characters and events.

Who is your favorite character and why?.....................
.....................

**Mind map!**



Words to describe Jack

How does Jack feel about being scary?.....................

How does he feel about Christmas Town when he first sees it?.....................
.....................

Why do you think he wants to change Halloween Town?.....................
.....................



Words to describe Sally

How does Sally feel about Jack?.....................
How does she feel about Jack's plans?.....................

Final Question! Do you think the people of Halloween Town learn anything by the end of the film?.....................
.....................
.....................

4.

Third, on November 5, Creusere reportedly yelled at two boys who were special needs students in an agriculture classroom. (Doc. 75-3; Doc. 75-4; Doc. 73 at 178). A girl in the class tried to explain to Creusere that the two boys he was yelling at were special needs students. (Doc. 75-3; Doc. 73 at 178-79). Creusere allegedly replied that his teaching plan didn't mention special needs students, and that the girl shouldn't tell him how to run his classroom. (Doc. 75-3; Doc. 75-4).

Afterwards, the girl and another student left the room to go to the restroom. (Doc. 73 at 179). After about 15-20 minutes they had still not returned, so Creusere sent another girl from the class to try and find them. (*Id.* at 179—80). The three girls went to the principal's office "in a bit of a panic" to report Creusere's behavior. (Doc. 75-3).

After the incident, the two boys' special needs teacher, who had not been in the room during the incident because it happened during her planning period, went to the classroom to investigate what had happened and to talk to Creusere. (Doc. 81 at 39). Creusere allegedly told her that if he had known that the class included special needs students, he never would have accepted that substitute assignment. (Id. at 33-34).

The school's principal also spoke with Creusere about the incident. (Doc. 78 at 49). Creusere said he was going to write a

behavior referral for one of the girls who had left the classroom to report Creusere's behavior. (Doc. 75-5). The principal told Creusere that the girl had left the room because she was frustrated with Creusere's treatment of the two boys, and that the principal's practice was to allow students in tense situations to go to his office instead of staying in the classroom and losing their temper. (*Id.*).

Two days after the incident involving the special needs students, Creusere met with the district superintendent. (Doc. 77 at 69-70). The superintendent discussed the three incidents with Creusere and, after hearing Creusere's side of the story, informed Creusere that he would be removed from the school district's substitute teacher list. (*Id.* at 48-49, 69-70). In accordance with his mandatory duties under Kentucky state law, the superintendent also submitted a report to the Education Professionals Standards Board detailing Creusere's actions and termination. (*Id.* at 52-53).

Creusere sued Defendants in Boone County Circuit Court in January 2021. (Doc. 1-1). Defendants removed to this Court because Creusere's suit included federal claims. (Doc. 1). Defendants filed their Answer in late February 2021, denying all of Creusere's claims. (Doc. 5). Creusere filed several pre-trial motions and objections (*see, e.g.*, Docs. 7, 8, 15, 55, 57, 64, 65, 66, 69), all of which the Court denied (*see* Docs. 14, 18, 62, 63, 74, 79).

The Court set a discovery deadline of January 31, 2023, and a dispositive motions deadline of February 28, 2023. (Doc. 61). Defendants filed their Motion for Summary Judgment, (Doc. 75), on February 28, 2023. Creusere requested an extension of time to respond, (Docs. 87, 89), which the Court granted (Doc. 90). Creusere filed his Response, (Doc. 99), on April 24, 2023.

### *Analysis*

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1)(A). The Court must resolve all ambiguities and draw all factual inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Summary judgment is inappropriate if the evidence would permit a reasonable jury to return a verdict for the nonmovant. *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992 (6th Cir. 1997) (citing *Anderson*, 477 U.S. at 255). But the nonmovant may not rest on mere allegations or denials of the other party's pleadings. Rather, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); Fed. R. Civ. P. 56(e)(2)).

**A. Sex discrimination**

Creusere's first claim is for sex discrimination. (Doc. 1-1 ¶ 43). Sex discrimination claims in the employment context are governed by Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2(a)(1). Creusere's Complaint doesn't specify whether he is seeking relief under federal or state law, but to the extent that he asserts claims under Kentucky law, the analysis and burden of proof are the same. *Arney v. Campbell*, 856 F. Supp. 1203, 1205 (W.D. Ky. 1994) (internal citations omitted).

Sex discrimination claims can be proven via direct or indirect (also called circumstantial) evidence. *Kilpatrick v. HCA Hum. Res., LLC*, No. 22-5307, 2023 WL 1961223, at *2 (6th Cir. Feb. 13, 2023) (citing *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648-49 (6th Cir. 2012)).

Direct evidence is that which, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quoting *Tennial v. UPS*, 840 F.3d 408, 414 (6th Cir. 2004)) (internal quotation marks omitted). If the plaintiff produces credible direct evidence, the burden shifts to the employer to show that it would have taken the

same action even without the discrimination. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005) (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Here, Creusere hasn't identified any direct evidence of sex discrimination, so this claim must rise or fall via indirect evidence.

Indirect evidence is that which, on its face, doesn't prove a discriminatory motive but allows a factfinder to reasonably infer that discrimination occurred. *Kilpatrick*, 2023 WL 1961223, at *2 (citing *Ondricko*, 689 F.3d at 649). An indirect evidence analysis follows the *McDonnell Douglas* burden shifting framework. *Id.* (citing *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020)).

Under that framework, the plaintiff must show prima facie discrimination, then the burden shifts back to the defendant to show a non-pretextual reason for the employment action. *Id.* (citing *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016)).

Prima facie discrimination requires showing that the plaintiff (1) was a member of a protected class, (2) was subjected to an adverse employment action, (3) was qualified for the position, and (4) similarly situated nonprotected employees were treated more favorably. *Id.* (quoting *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)). When, as here, a plaintiff is

claiming so-called "reverse" discrimination, elements (1) and (4) get modified. *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569 (6th Cir. 2009) (citing *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004)).

Under the modified element (1), the plaintiff must "demonstrate background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Id.* (quoting *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (cleaned up). Most Sixth Circuit cases addressing this element do so in the reverse-race-discrimination context, not the reverse-sex-discrimination context we have here. But the rationales in those cases can still be applied here.

Examples of background circumstances sufficient to satisfy the modified element (1) include: a Hispanic manager replacing a white employee with a Hispanic employee; statistical data showing that the employer considered race in employment decisions; an African American police chief favoring the promotion of African Americans; an organizational preference for creating diverse groups of employees; and ongoing racial tension in the workplace. *Nelson v. Ball Corp.*, 656 F. App'x 131, 136-37 (6th Cir. 2016) (collecting cases); *Boger v. Wayne Cnty.*, 950 F.2d 316, 324-25 (6th Cir. 1991).

None of those situations is present here. The superintendent who fired Creusere was also a man, so Creusere can't argue that he was fired by and replaced by someone of a different sex. Creusere hasn't pointed to any statistical data showing that the school district considers sex in its employment decisions. Nor has he shown any evidence of a preference for diverse employees, or any evidence of tension between the sexes in the workplace.

The only evidence Creusere highlights to show a contrast in treatment between the sexes is the fact that he was fired, while a female teacher was not. But "[Creusere's] own situation cannot provide that contrast, for it would make little sense to say that the instant claim is itself a key part of the 'background circumstances' against which it will be evaluated." *Treadwell v. American Airlines, Inc.*, 447 F. App'x 676, 679 (6th Cir. 2011). Accordingly, Creusere hasn't satisfied the modified element (1) of a prima facie sex discrimination claim.

Under the modified element (4), the plaintiff must show that there were employees who were similarly situated but weren't members of the protected class, and that the employer treated them differently. *Simpson*, 359 F. App'x at 569 (quoting *Sutherland*, 344 F.3d at 614).

"Similarly situated" means that all of the relevant aspects of the plaintiff's employment are nearly identical to those of the employee who was treated differently. *Morris v. Family Dollar*

12

*Stores of Ohio, Inc.*, 320 F. App'x 330, 340 (6th Cir. 2009) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1998) (abrogated on other grounds by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000))). The employee with whom the plaintiff compares himself must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (internal quotation marks omitted).

Here, the employee whom Creusere compares himself to is a female teacher who worked at Walton-Verona Middle School. (Doc. 99 at 5-6). That teacher was not a member of the same class (male) as Creusere, and she was treated differently by the school district because she wasn't fired like Creusere. The remaining question is whether that teacher and Creusere were similarly situated.

They were not. The teacher in question showed her students an animated children's movie and had them complete an assignment related to the movie. Creusere brought to the school a homemade poster that showed a skull and crossbones and suggested cannibalizing children and eating them with BBQ sauce. Creusere argues that the children's movie and his poster are both "parodies," and so he and the teacher were engaged in the same conduct and were thus similarly situated. (*Id.*).

First, it's unclear how or why the children's movie or Creusere's poster qualify as a parody. A parody is "a humorous or satirical imitation of a serious piece of literature or writing." Webster's Unabridged Dictionary 1412 (2d ed. 2001). By his own admission, Creusere's poster was based on an Outback Steakhouse menu and was not part of any academic lesson plan. (Doc. 73 at 152; Doc. 99-1 at 2). A restaurant menu is not a serious piece of literature or writing.

Putting the parody issue aside, showing students a movie in connection with an educational assignment and showing them a homemade poster that suggests eating them are not the same conduct. In other words, there were differentiating circumstances that distinguished the teacher's conduct and her treatment by the school district from Creusere's conduct and his treatment by the school district. *See Morris*, 320 F. App'x at 340. Accordingly, the teacher and Creusere weren't similarly situated, so Creusere hasn't satisfied the modified element (4) of a prima facie sex discrimination claim.

Even if Creusere had satisfied all four elements to show prima facie sex discrimination, the burden would simply shift back to Defendants to show a non-pretextual reason for firing Creusere. *See Kilpatrick*, 2023 WL 1961223, at *2. And Defendants easily meet that burden.

14

They have identified multiple reasons for Creusere's firing, stemming from the three incidents in November 2019: the alleged comment to a seventh grader that she could be Creusere's girlfriend; the poster that suggested eating children; and Creusere's yelling at special needs students and his threat to discipline a student for reporting that behavior. (Doc. 77 at 28–29, 69; *see also* Doc. 73 at 245-47).

To meet his burden under the *McDonnell Douglas* framework, Creusere would have to show that those non-pretextual reasons were, in fact, pretextual. He could do so by showing that those reasons (1) had no basis in fact, (2) didn't actually motivate his firing, or (3) were insufficient to explain the firing. *Simpson*, 359 F. App'x at 569 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds by *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009))).

Regardless of which option is used, Creusere would have to produce sufficient evidence that would allow a jury to reasonably reject the school district's reason for the firing and infer that the real reason was discrimination. *Id.* (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)) (cleaned up). But even then, if the school district had an honest belief in its reasons for firing Creusere—that is, if the decision was reasonably informed and considered—then Creusere cannot establish that those reasons were pretextual even if they were wrong. *Id.* at 570

15

(quoting *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009)) (internal quotation marks omitted).

Here, Creusere focuses mostly on options (1) and (2). For (1), he argues that the alleged incidents that led to his firing had no basis in fact (Creusere doesn't use that exact phrasing, but says things like "untrue claim," "false," "false claim," and "untrue allegations."). (*See, e.g.*, Doc. 99 at 12–13; Doc. 99-1 at 2–3, 7). But for the most part, Creusere doesn't indicate any evidence in the record that would allow a jury to find that the school district's allegations had no basis in fact.

As to the first incident—the allegation that he told a seventh grader she could be his girlfriend—Creusere does identify portions of the record that would create a genuine dispute of fact as to whether that allegation is true. He points out that the teacher who allegedly overheard that conversation said it happened on the second floor of the school building, (Doc. 91 at 26–27), but the classroom that Creusere was assigned to that day was on the first floor of the building (Doc. 94 at 35). He also points out that the hallways in the school can be very noisy, so it can be difficult to hear a conversation coming from inside a room. (*Id.* at 47). And Creusere testified in his own deposition that the conversation—or at least the version recounted by the teacher who allegedly overheard it—never occurred. (Doc. 73 at 112).

16

But as to the other two incidents—the poster and the yelling at the special needs students—Creusere doesn't identify anything in the record to suggest that those allegations have no basis in fact. He just makes conclusory assertions to that effect. (*See, e.g.,* Doc. 99 at 12, arguing that the school district's characterization of his bizarre behavior is an "untrue claim"; Doc. 99-1 at 7, denying Defendants' "untrue allegations.").

In fact, not only did Creusere not identify evidence that these allegations had no basis in fact—he actually admitted to them. He admitted that he made the poster himself, brought it to the school, showed the students, and talked with them about it. (Doc. 73 at 122-23, 153-54). And he admitted raising his voice at the two special needs students (*Id.* at 178).

The second option Creusere uses to argue that the school district's reasons for his firing were pretextual is that those reasons didn't actually motivate his firing. The crux of Creusere's argument here is that the reasons given for his firing kept "changing" over time, so they must not have been the real motivation behind the school district's actions. (Doc. 99 at 3; Doc. 99-1 at 3, 6). He says the superintendent first told him that he was fired for "insubordination," but he was later told that he was fired for inappropriate conduct and an unwillingness to accept responsibility for the alleged misconduct. (Doc. 99-1 at 4-6).

Contrary to Creusere's suggestion, there is no inconsistency here. "Insubordination" and "inappropriate conduct" are broad phrases that easily encompass the three incidents that led to Creusere's firing. The superintendent specifically said that it was those three incidents that led the district to fire Creusere: ". . . [T]hat was our discussion on November 7th, where we discussed three separate incidents where you displayed very poor judgment and a temperament, which in my opinion, is unsuitable for working with adolescents." (Doc. 77 at 70).

Lastly, even if Creusere could show that the district's proffered reasons for firing him were pretextual, Defendants would still be protected by the honest belief rule. The district superintendent testified multiple times that his actions were based on thorough documentation from teachers and administrators at the school:

> "I acted based on documentation I received from other school employees."

> "Because I had written documentation from multiple certified employees, which indicated at times bizarre behavior on your part, instances where you behaved in a manner which suggested you did not have the temperament to work with adolescents."

> "At the time when I made the decision that you should no longer work as a substitute teacher in this district, I based that decision on the written statements I received from multiple individuals in this district."

(*Id.* at 940, 969, 1012). Therefore, the decision to fire Creusere was reasonably informed and considered, so Defendants are protected by the honest belief rule. *See Simpson*, 359 F. App'x at 570.

Accordingly, because Creusere cannot show prima facie sex discrimination or that the school district's reasons for firing him were pretextual, and because Defendants would be protected by the honest belief rule, Creusere cannot satisfy his burden under the *McDonnell Douglas* framework. His sex discrimination claim must fail as a matter of law.

**B. Age discrimination**

Creusere's next claim is for age discrimination. (Doc. 1-1 ¶ 43). Age discrimination claims are governed by the Age Discrimination in Employment Act of 1967, which prohibits age discrimination for applicants and employees over 40 years old. 29 U.S.C. §§ 623(a), 631. Creusere's Complaint doesn't specify whether he is seeking relief under federal or state law, but to the extent that he asserts claims under Kentucky law, the analysis and burden of proof are the same. *Arney*, 856 F. Supp. at 1205 (internal citations omitted).

A plaintiff bringing an age discrimination claim must prove by a preponderance of the evidence that age was the but-for cause of the employer's action. *Alberty v. Columbus Twp.*, 730 F. App'x 352, 356 (6th Cir. 2018) (quoting *Gross v. FBL Fin. Servs., Inc.*,

557 U.S. 167, 175 (2009)). Age discrimination claims work the same way as sex discrimination claims. The plaintiff can prove his case via direct or indirect evidence. *Id.* (citing *Gross*, 557 U.S. at 177–78). Creusere offers no direct evidence that the school district discriminated against him because of his age, so he must rely on indirect evidence and the *McDonnell Douglas* framework.

Under that framework, the plaintiff must show prima facie discrimination, then the burden shifts back to the defendant to show a non-pretextual reason for the employment action. *Id.* (quoting *Geiger*, 579 F.3d at 622). A prima facie case of age discrimination requires proof that the plaintiff (1) was a member of a protected class, (2) was discharged, (3) was qualified for the position, and (4) was replaced by someone outside of the protected class. *Id.* (quoting *Geiger*, 579 F.3d at 622).

Here, Creusere's age discrimination claim fails as a matter of law because he has not identified evidence in the record to show prima facie age discrimination. Creusere is a member of the protected class for age discrimination claims because he is over 40 years old. He was fired from his position as a substitute teacher, a position he was qualified for. But he hasn't shown—or even attempted to show—that he was replaced by someone outside of the class of people over 40.

And even if he had shown that and thereby proven prima facie age discrimination, Defendants have offered multiple non-

pretextual reasons for Creusere's firing—namely, the three incidents discussed above. Accordingly, because Creusere hasn't identified anything in the record to create a genuine dispute of fact as to his age discrimination claim, that claim must fail as a matter of law.

### C. Disability discrimination

Creusere's next claim is for disability discrimination. (Doc. 1-1 ¶ 48). The Americans with Disabilities Act of 1990 (ADA or the Act), amended in 2008, prohibits covered employers from discriminating against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). Once again, Creusere's Complaint doesn't specify whether he is seeking relief under federal or state law, but to the extent that he asserts claims under Kentucky law, the analysis and burden of proof are the same. *See Perry v. Norton Hosps., Inc.*, No. 3:21-cv-00192-RGJ, 2023 WL 2755306, at *8 (W.D. Ky. Mar. 31, 2023) (citations omitted).

Like sex and age discrimination claims, disability discrimination claims may be proven via direct or indirect evidence. *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016) (abrogated on other grounds by *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019))).

Direct evidence requires no inference to conclude that the employer discriminated. *Perry*, 2023 WL 2755306, at *8. It usually involves a written or spoken comment explicitly stating that the employer discriminated because of the employee's disability. *Id.* Creusere doesn't identify any such evidence in the record here, so this claim must rely on indirect evidence.

Disability discrimination claims using indirect evidence are analyzed under the *McDonnell Douglas* framework. *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)). To establish a prima facie case, a plaintiff must show that (1) he has a disability, (2) he is otherwise qualified for the job with or without reasonable accommodation, (3) he suffered an adverse employment action, (4) the employer knew or had reason to know of his disability, and (5) his position remained open or he was replaced. *Id.* (citing *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017)).

For element (1), there are three methods to show a disability. 42 U.S.C. § 12102(1)(A)–(C). The method the parties focus on here is to show a physical or mental impairment that substantially limits a major life activity. *Id.* § (1)(A). Under this method, the "substantially limits" language should be broadly construed in favor of expansive coverage and is not a demanding standard. 29 C.F.R. § 1630.2(j)(1)(i). The impairment doesn't have to prevent,

22

or even significantly restrict, the plaintiff from performing a major life activity. *Id.* § (j)(1)(ii).

The major life activity that the parties focus on here is "working." (Doc. 75 at 14). Defendants cite *Tinsley v. Caterpillar Financial Services, Corp.*, 766 F. App'x 337, 342 (6th Cir. 2019), to argue that a plaintiff who asserts that his impairment substantially limits his working ability must still show that he is limited in his ability to perform a class of jobs or a broad range of jobs. (Doc. 75 at 14). In their view, Creusere hasn't done that, because he "was physically capable of working as a substitute teacher." (*Id.*).

But *Tinsley* is distinguishable. The Sixth Circuit pointed out that "Tinsley has asserted that her impairment (PTSD) impacted *only* the major life activity of working." *Tinsley*, 766 F. App'x at 342 (emphasis added). Creusere, in contrast, has asserted that his impairments impact other areas of his life too. He testified that his spinal injury prevents him from walking or standing for any length of time. (Doc. 73 at 94). Walking and standing are both defined as major life activities under the ADA. 42 U.S.C. § 12102(2)(A).

The contrast between the plaintiff in *Tinsley* and Creusere—that is, between one whose impairment only impacts their ability to work, and one whose impairment impacts other aspects of life as well—reveals why Defendants' focus on working is inconsistent with

23

how the ADA has been interpreted since the 2008 amendments. Following those amendments, the major life activity of working "will be used in only very targeted situations." 29 C.F.R. § 1630 Appendix. Those targeted situations are "the rare cases where an individual has a need to demonstrate that an impairment substantially limits him or her in working[.]" *Id.*

Usually a plaintiff has no such need, because he can establish coverage under the ADA by showing a substantial limitation of a major life activity *other* than working. *Id.* In other words, if the impairment limits a person's ability to work, it probably limits other major life activities too. *Id.* This is "particularly true in light of the changes made by the ADA Amendments Act[,]" which created an "expanded definition of disability[.]" *Id.*

That expanded definition easily encompasses Creusere's disabilities. And Creusere has identified enough evidence in the record to prove that he has those disabilities. He discusses his three disabilities at length in his deposition. (Doc. 73 at 94-102). He also offers testimony from his neighbor, who confirmed that Creusere went through an ADA process in order to receive a handicap parking designation. (Doc. 97 at 15-16). Therefore, Creusere has offered enough evidence to create a genuine dispute of fact as to element (1) of a prima facie disability discrimination claim.

As to the remaining four elements, Defendants don't dispute them. Instead, they repeat the same argument they made about the sex and age discrimination claims: under the *McDonnell Douglas* framework, even if Creusere could make out a prima facie case of disability discrimination, the school district has still offered multiple non-pretextual reasons for firing Creusere. (Doc. 75 at 14–15).

And indeed they have. Any of the three incidents discussed above would be grounds to fire a substitute teacher. Further, as Defendants point out, even if the particularized facts about those alleged incidents turned out to be wrong, the district superintendent honestly believed them to be true based on what several teachers and administrators told him. (Doc. 77 at 940, 969, 1012). Therefore, the decision to fire Creusere was reasonably informed and considered, so Defendants are protected by the honest belief rule. *See Simpson*, 359 F. App'x at 570. Accordingly, Creusere's disability discrimination claim must fail as a matter of law.

### D. Hostile work environment

Creusere's next claim (or potential next claim) is for hostile work environment as a disabled person. (Doc. 1-1 ¶ 48). Creusere's Complaint doesn't specifically enumerate this claim in a separate paragraph. Instead, there is one sentence that mentions both disability discrimination and hostile work environment: "That the

plaintiff suffered discrimination as a disabled person in a hostile work environment for the disabled." (*Id.*).

Hostile work environment and disability discrimination are two different claims. Each has its own set of elements. But because of how Creusere's Complaint is written, it's unclear whether he is pursuing both claims, or just one. Neither side addresses the elements of a hostile work environment claim in their briefing.

Nevertheless, for the sake of completeness, the Court assumes that Creusere intended to bring both claims and will address the elements of a hostile work environment claim.

To maintain a claim for a hostile work environment under the ADA, a plaintiff must show that (1) he was disabled, (2) he was subjected to unwelcome harassment, (3) the harassment was based on his disability, (4) the harassment unreasonably interfered with his work, and (5) the defendant knew or should have known about the harassment, and failed to do anything about it. *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (citing *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir. 1997), and *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996)).

Neither party directly addresses these elements. The closest Creusere comes is when he quotes a Kentucky Supreme Court case to explain what counts as "hostile environment discrimination." (Doc. 99 at 11). That quotation is sandwiched between a paragraph explaining how Walton-Verona Middle School's "star rating system"

status was downgraded, and a paragraph explaining that Creusere had discussed disability concerns with the district superintendent. (*Id.*).

Nowhere does Creusere mention anything about harassment, interference with his work, or whether the district knew about any harassment. Accordingly, because Creusere hasn't identified anything in the record that would create a genuine dispute of fact as to a hostile work environment claim, that claim must fail as a matter of law.

### E. Retaliation

Creusere's next claim is for retaliation. (Doc. 1-1 ¶ 49). The ADA prohibits retaliating against an employee for opposing practices that are illegal under the Act. 42 U.S.C. § 12203(a). When, as here, the plaintiff seeks to prove retaliation via indirect evidence, the *McDonnell Douglas* framework applies and the plaintiff must show a prima facie case of retaliation. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)).

Such a case requires showing that (1) the plaintiff engaged in protected activity under the ADA, (2) the employer knew of the activity, (3) the employer took adverse action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse action. *Id.* (citing *A.C.*, 711 F.3d at 697).

27

For element (1), "[p]rotected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Id.* (quoting *Goonan v. Fed. Rsrv. Bank of N.Y.*, 916 F.Supp.2d 470, 484–85 (S.D.N.Y. 2013)) (internal quotation marks omitted). Charging an employer with violating the ADA constitutes protected activity as long as the employee clearly conveys opposition to the suspected discrimination. *See Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 842 (6th Cir. 2002) (internal citation omitted); *see also MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 463 (6th Cir. 2011) (internal citation omitted).

Defendants argue that Creusere's only mention of engaging in protected activity is his "bare allegation" in the Complaint that he raised concerns about safety and special needs students with the superintendent. (Doc. 75 at 17).

Creusere responds that he engaged in protected activity by advocating for disability issues via "disability discourse." (Doc. 99 at 7). In a single paragraph, he lists several examples of that supposed discourse. (*Id.*). Some are connected to his work with the school district; others are not. (*Id.*).

First, Creusere says he engaged in discourse "concerning his parking space and ramp at his home[.]" (*Id.*). He points to testimony from his neighbor about the process of getting a handicapped parking space as proof that he is "serious about disability issues." (*Id.* at 8). But any "discourse" about the

28

parking space and ramp at his home, or the fact that he is serious about disability issues, has nothing to do with his employment. Creusere hasn't shown how a discussion about the parking space at his home is a protected activity under the ADA.

Next, Creusere says he engaged in discourse about "the steps replacing a ramp in the entrance of the middle school forcing the disabled to walk a much greater distance from the parking lot[.]" (*Id.* at 7). Creusere doesn't say whether reporting something like this would qualify as a protected activity under the ADA. Even if he did, he doesn't cite anything in the record to show that he discussed the issue with the school district. He cites to some photographs showing the construction work happening (Doc. 98-1 at 13–15), but he offers no evidence that he communicated his opposition to it.

Next, Creusere says he engaged in discourse about "questioning and reporting deficient special needs teaching in the Ag[riculture] room[.]" (Doc. 99 at 7). Advocating for members of a protected class, including disabled students, is a protected activity for the purpose of a retaliation claim. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 662–64 (6th Cir. 2020) (internal citations omitted). But Creusere doesn't cite anything in the record to show that he discussed this issue with the school district. He says that he "spent time bringing disabled concerns, and special needs students concerns he had observed to

29

the attention of [the superintendent.]" (Doc. 99-1 at 3). He then cites to a page of the superintendent's deposition, but the testimony on that page doesn't say anything about raising concerns regarding special needs students.

Next, Creusere says he engaged in discourse about "reporting disability concerns to [the district superintendent][.]" (Doc. 99 at 7). The superintendent confirmed in his deposition that Creusere did indeed raise "concerns that [he] had regarding disabled [*sic*]." (Doc. 77 at 34). Taking the evidence in the light most favorable to Creusere, as the Court is required to do, it's reasonable to conclude that raising concerns about disability issues with the superintendent could be an "action taken to protest or oppose a statutorily prohibited discrimination[,]" and would thus qualify as a protected activity. *See Rorrer*, 743 F.3d at 1046.

Lastly, Creusere says he engaged in discourse about his "observation that Plaintiff was the only observed disabled person in the WV school district . . ., several requests for an ADA grievance procedure, and an OCR mediation with another school district on December 16, 2019." (Doc. 99 at 7). But he doesn't cite to anything in the record showing that he raised these issues with the school district.

In a different section of his Response, Creusere states that he "requested accommodations that resulted in spilling spaghetti on himself from a door that closed on him . . . fell on September

30

13, 2019, asked for forms to file a written grievance and was told they didn't have any." (*Id.* at 9). He then says that he "specifically indicated on the form, in good faith, regarding his concern that the district was discriminating against the disabled." (*Id.*). It's unclear whether Creusere is arguing that these actions constituted protected activity under the ADA.

Creusere did cite to a specific portion of the record—his own deposition—to demonstrate that he filled out a form (though he doesn't know what exactly the form was) after his fall. (Doc. 73 at 105–06). And on that form, he indicated his belief that the school district's actions in replacing a ramp with a set of stairs constituted discrimination against the disabled. (*Id.*). In other words, viewing the evidence most favorably to the nonmovant, Creusere charged the district with violating the ADA. And he did so in a way that clearly conveyed his opposition to the suspected discrimination. *See Barrett*, 36 F. App'x at 842.

So, in sum, Creusere has provided evidence of two actions—sharing concerns about disability issues with the district superintendent, and reporting suspected discrimination on the form he filled out after his fall—which qualify as protected activities for purposes of a prima facie retaliation claim.

That still leaves the remaining three elements. Two of them are easily met here. For element (2), the school district knew about Creusere's sharing his disability concerns because those

concerns were shared directly with the superintendent. (Doc. 73 at 943). It also knew that Creusere had shared his concerns on the form he filled out, because the district presumably provided him with that form and reviewed it when he submitted it. For element (3), there is no question that the school district took an adverse action against Creusere, because it fired him.

That leaves the fourth and final element: was there a causal connection between the protected activities and Creusere's firing? *See Rorrer*, 743 F.3d at 1046. To show a causal connection, Creusere must produce enough evidence to infer that the school district wouldn't have fired him had he not engaged in the protected activity. *Kirilenko-Ison*, 974 F.3d at 664 (quoting *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)). Such an inference may arise "solely from the closeness in time between the point at which an employer learns of an employee's protected activity and the point at which it takes an adverse action against that employee." *Id.* (citing *Weigel*, 302 F.3d at 381).

Defendants argue that Creusere hasn't proven any motive for retaliation and that a pure temporal relationship, i.e., Creusere complained about disability issues and afterwards was fired, cannot establish a causal connection. (Doc. 75 at 17).

The case they cite for that latter argument—*Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 859 (6th Cir. 2002)—

32

doesn't explain why "[a] pure temporal relationship (A occurred after B) is not enough to establish a causal connection." The case that *Coulson* itself relies on—*Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)—is almost 40 years old and also contains no explanation for that proposition.

More recent cases like *Kirilenko-Ison*, 974 F.3d at 664, and *O'Donnell*, 833 F. App'x at 621—both from 2020—explicitly allow for temporal proximity to support a causal connection, especially in situations where the adverse action occurs "very close in time" after the employer learns of the protected activity.

In his Response, Creusere never lays out the elements of a prima facie retaliation claim (or the elements of any other claim for that matter) and so doesn't directly address the causal connection element. He does say that the Defendants had "ample motivation" to "silence" him after he engaged in the protected activity. (Doc. 99 at 10). Most of this section of the Response discusses how the Kentucky Department of Education school accountability system works. (*Id.* at 10-11). It also mentions that, under that system, Walton-Verona Middle School was "downgraded" by one star because of an achievement gap for disabled students. (*Id.* at 10). It's unclear how, or even whether, this is meant to be an argument as to the causal connection element (or any other element) of Creusere's retaliation claim.

Given that establishing a prima facie retaliation claim is meant to be a "low hurdle," *Rorrer*, 743 F.3d at 1046, that is "easily met," *Kirilenko-Ison*, 974 F.3d at 661, and given that the school district learned of Creusere's protected activity and then fired him very closely in time, it can be reasonably inferred that there is a causal connection between the protected activity and the firing. Accordingly, Creusere has satisfied all four elements of a prima facie retaliation claim.

However, as was the case for all of Creusere's previous claims, his retaliation claim is analyzed under the *McDonnell Douglas* framework. *Rorrer*, 743 F.3d at 1046. Therefore, even though he has shown a prima facie case for retaliation, the Defendants may still defeat that claim by showing a legitimate, non-pretextual reason for firing him. *Kirilenko-Ison*, 974 F.3d at 661. They have done so via the three incidents discussed above. Accordingly, Creusere's retaliation claim must fail as a matter of law.

**F. Defamation**

Creusere's next claim is for defamation. (Doc. 1-1 ¶¶ 44-47). The elements of a defamation claim are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Süd-Chemie, Inc.*, 458

34

S.W.3d 276, 281–82 (Ky. 2014) (quoting Restatement (Second) of Torts § 558 (1977)) (internal quotation marks omitted).

Creusere's Complaint alleges two instances of defamation. First, he alleges that a school counselor defamed him by reporting that she had overheard Creusere telling a student that she could be his girlfriend. (Doc. 1-1 ¶ 39; Doc. 99 at 13). Second, he alleges that the superintendent defamed him by submitting a report to the Education Professionals Standards Board which detailed the three incidents that allegedly led to his firing. (Doc. 1-1 ¶ 42).

As to the first instance, Defendants argue that they are protected by a qualified privilege. (Doc. 75 at 18–20). Kentucky law recognizes a privilege when someone communicates something to another person, and both parties have an interest in the communication. *Toler*, 458 S.W.3d at 282 (quoting *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004) (overruled on other grounds)) (internal quotation marks omitted). This privilege is routinely applied in the employment context. *Id.* (citing *Dossett v. N.Y. Min. & Mfg. Co.*, 451 S.W.2d 843, 845–46 (Ky. Ct. App. 1970)).

In that context, the purpose of the privilege is to allow employers to discuss matters freely, even if those discussions end up being based on erroneous beliefs or misinformation. *Id.* at 286. When the qualified privilege is applied to a per se defamation claim, it negates the presumption of malice. *Id.* at 283. As a

result, the burden is on the plaintiff to show actual malice. *Id.* (quoting *Weinstein v. Rhorer*, 240 Ky. 679, 42 S.W.2d 892, 895 (Ky. 1931) (internal quotation marks omitted).

The plaintiff can do so by showing: "(1) the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; (2) the publication of the defamatory matter for some improper purpose; (3) excessive publication; or (4) the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged." *Id.* at 284 (quoting Restatement (Second) of Torts § 596 cmt. a (1977)) (internal quotation marks omitted).

Here, Creusere makes no attempt to show malice via any of those methods. In fact, he doesn't address Defendants' qualified privilege argument at all. Instead, he focuses on whether his alleged "girlfriend" conversation actually happened. (Doc. 99 at 12–14). But the question of whether it happened and the question of whether the school counselor exhibited malice by reporting it are two separate inquiries. As the Kentucky Supreme Court said, "With the qualified privilege, it is not so much *what* was said as it is *how* it was said." *Toler*, 458 S.W.3d at 284. Because Creusere hasn't identified any evidence to show malice, Defendants are protected by the qualified privilege.

As to Creusere's second alleged instance of defamation—the district superintendent's report to the standards board—Defendants offer three arguments.

First, they argue that, under Kentucky law, the superintendent was required to submit that report, so it cannot be considered defamation. (Doc. 75 at 20). Creusere doesn't respond to this argument. In fact, in a different section of his Response, he quotes the Kentucky statute that the Defendants are referring to and seems to acknowledge that the superintendent was required to submit the report. (Doc. 99 at 2-3). Even though Creusere doesn't respond to Defendants' argument on this point, it will be addressed here.

Under Ky. Rev. Stat. § 161.120(2)(a), the superintendent of each school district is required to report any certified school employee who "may have engaged in any actions or conduct while employed in the school district that might reasonably be expected to warrant consideration for action against" that employee's certification.

Here, by his own admission, Creusere held a certification (or at least he used to, the renewal was pending at the time of his deposition) from the standards board. (*See* Doc. 99 at 13; Doc. 73 at 37-39). And he may have engaged in conduct—the three incidents that led to his firing—that could reasonably be expected to warrant action against his teaching certification. Therefore, the district

37

superintendent was required by law to submit his report to the standards board, so that action cannot constitute defamation.

Defendants' second argument as to why the superintendent's report doesn't constitute defamation is that the report said that Creusere was fired, which was true, and under Ky. Rev. Stat. § 411.045, truth is a complete defense to a defamation claim. (Doc. 75 at 20).

Creusere doesn't respond to this argument either. He doesn't discuss Ky. Rev. Stat. § 411.045 or argue that it's inapplicable or that the superintendent's report wasn't true. In fact, he admitted in his own deposition that what the report said, i.e., that he was fired, was true. (Doc. 73 at 147).

The only thing Creusere claims wasn't true were claims made to the EEOC. (Doc. 99 at 12). But that has nothing to do with the superintendent's report to the standards board. And Creusere's Complaint doesn't say anything about statements made to the EEOC forming the basis of a defamation claim. *See Tucker v. Union of Needletrades, Indust. and Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (noting that a plaintiff may not raise a new claim for the first time in response to a summary judgment motion) (citations omitted). Therefore, because Creusere admits that the report he claims is defamatory was true, that report cannot constitute defamation.

Defendants' third argument as to why the superintendent's report doesn't constitute defamation is that, under Kentucky law, any document used in a proceeding before a state or city legislative board cannot be the basis of a defamation claim. (Doc. 75 at 20). Once again, Creusere doesn't answer this argument, but it will be addressed here.

Ky. Rev. Stat. § 411.060 says, in relevant part, that "[t]he publication of a . . . document presented, filed, or used in any proceeding before any state or city legislative or executive body, board or officer, shall be privileged, unless it is proved that the publication was maliciously made." "Maliciously made" means that the statement was made "solely for the purpose of causing harm to the person defamed." *Chatterjee v. CBS Corp.*, No. 6:19-CV-212-REW, 2020 WL 592324, at *5 (W.D. Ky. Feb. 6, 2020) (quoting *Smith v. Martin*, 331 S.W.3d 637, 641 (Ky. Ct. App. 2011)) (internal quotation marks omitted).

Here, the superintendent's report was presented, filed, or used in a proceeding before the Education Professionals Standards Board. (Doc. 96 at 122). Therefore, the report is privileged unless it is proved that it was made solely for the purpose of harming Creusere. Creusere has made no such argument, nor could he. As discussed above, the superintendent was required by law to submit the report. Therefore, the submission was made at least in part to comply with the law, so it cannot be said that the superintendent

39

submitted the report "solely" to cause harm to Creusere. Accordingly, the superintendent's report is privileged under Ky. Rev. Stat. § 411.060 and cannot be the basis of a defamation claim.

Because neither instance of alleged defamation can survive summary judgment, that claim must fail as a matter of law.

### G. First Amendment

Creusere's Response includes a section arguing that the homemade poster he brought to the school was "Constitutionally Protected First Amendment Speech." (Doc. 99 at 4). This appears to be a free speech retaliation claim. This claim wasn't included in Creusere's Complaint, and a new claim cannot be raised for the first time in response to a summary judgment motion. *Tucker*, 407 F.3d at 788. Even if this claim was included in the Complaint, it would still fail.

Free speech retaliation cases in the employment context involve three questions. First, was the plaintiff involved in "constitutionally protected" activity, i.e., activity that would be protected by the First Amendment's free speech clause? Second, would the employer's action discourage persons of "ordinary firmness" from doing what they were doing? And third, was the employee's exercise of constitutionally protected rights "a motivating factor" in the employer's conduct? *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332,

337 (6th Cir. 2010) (internal quotation marks and citations omitted).

The first of those three questions has three subparts. First, the First Amendment protects an employee's speech only when that speech involves "matters of public concern." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)) (internal quotation marks omitted). Matters of public concern are those "of political, social, or other concern to the community[.]" *Connick*, 461 U.S. at 146.

Second, if a plaintiff establishes that the speech in question involved matters of public concern, then a balancing test is used to determine who wins—the employee or the employer. *Evans-Marshall*, 624 F.3d at 338 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572–73 (1968)). The Court balances the employee's interest in commenting on matters of public concern with the State's interest in promoting efficient public services. *Id.* (quoting *Pickering*, 391 U.S. at 568).

Third, whether the First Amendment applies at all depends on whether the employee's speech was made pursuant to the employee's job duties. *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). If the speech was made as part of the employee's job, then the speaker is not really the employee, it is the government entity that employs that person, so the First Amendment doesn't apply. *Id.*

Here, Creusere's free speech retaliation claim doesn't satisfy the first subpart of the first question because it doesn't involve a matter of public concern. The spoof of the Outback Steakhouse menu was not related to any political, social, or other concern to the community. Therefore, Creusere's conduct was not constitutionally protected speech under the First Amendment. Accordingly, his free speech retaliation claim must fail as a matter of law.

**H. Governmental immunity**

Defendants argue that even if Creusere's claims didn't fail as a matter of law, the school district, superintendent, and principal and vice principal of Walton-Verona Middle School, in their official capacities, would all be protected by governmental immunity. (Doc. 75 at 21). Creusere doesn't respond to this argument. The Sixth Circuit has held that when a party fails to respond to an argument in a motion, the district court may assume that opposition to the motion is waived and may grant the motion. *Justice v. Atchison*, No. 5:08-148-JMH, 2009 WL 3413914, at *2 (E.D. Ky. Oct. 20, 2009) (collecting cases and granting summary judgment where plaintiff offered no opposition to defendants' claims that they were entitled to qualified immunity). Accordingly, the Court assumes that Creusere waives any opposition to this argument.

**I. Qualified immunity**

42

Defendants also argue that the superintendent, counselor, and principal and vice principal of Walton-Verona Middle School, in their individual capacities, are shielded by qualified immunity under Kentucky law. (Doc. 75 at 22).

Qualified immunity protects public officers and employees from damages liability when they make good faith judgment calls in a legally uncertain environment. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citing 63C Am. Jur. 2d, Public Officers and Employees, § 309 (1997)). It "applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, . . . (2) in good faith; and (3) within the scope of the employee's authority." *Id.*

Defendants argue that the superintendent's decision to fire Creusere was discretionary, made in good faith, and was within his authority. (Doc. 75 at 23). They also argue that the decisions of the school counselor, principal, and vice principal to report Creusere's behavior were discretionary, made in good faith, and within their authority. (*Id.*).

Creusere doesn't address Defendants' qualified immunity argument as to the school counselor or the principal or vice principal of Walton-Verona Middle School, so the Court assumes

43

that Creusere has waived opposition to qualified immunity for those defendants. *See Justice*, 2009 WL 3413914, at *2.

Creusere does, however, contest qualified immunity for the superintendent. (Doc. 99 at 2-4). Creusere argues that the superintendent failed to properly perform his ministerial duty to report Creusere's behavior to the standards board. Specifically, Creusere says that the statute governing that process requires the superintendent to include any relevant documents or records when he submits the report, and that the superintendent here failed to do that. (*Id.* at 3). Thus, Creusere argues, the superintendent negligently performed a ministerial duty, and negligence in a ministerial duty can't give rise to qualified immunity. (*Id.* at 4).

But Defendants' qualified immunity argument for the superintendent is based not on the ministerial duty of filing a report, but on the discretionary duty of deciding whether and when to fire an employee. (Doc. 75 at 23). The decision to fire someone involves "the exercise of discretion and judgment, or personal deliberation, decision, and judgment[.]" *Yanero*, 65 S.W.3d at 522. So the superintendent's decision to fire Creusere was a discretionary function, thus satisfying element (1) of the qualified immunity analysis.

44

There is also no question that the decision to fire a school employee is within the scope of the superintendent's authority, thus satisfying element (3) of the qualified immunity analysis.

The question, then, is whether the superintendent's decision to fire Creusere was made in good faith. *See id.* To show that a decision was not made in good faith, a plaintiff can point to a violation of a constitutional, statutory, or other clearly established right, or the plaintiff can show that the defendant willfully or maliciously intended to harm him. *Id.* at 523.

Here, Creusere hasn't attempted to show either of those things. His discussion of the qualified immunity issue is limited to arguing that the superintendent was only performing a ministerial duty and thus cannot have qualified immunity. (Doc. 99 at 2-4). Therefore, Creusere hasn't identified anything in the record to show that the superintendent is not entitled to qualified immunity.

***Conclusion***

Therefore, for the reasons stated above, **IT IS ORDERED** that:

(1)   Defendants' Motion for Summary Judgment, (Doc. 75), be, and is hereby, **GRANTED**.

(2)   A separate judgment shall enter with this opinion.

This 5th day of June 2023.



Signed By:

***William O. Bertelsman***

**United States District Judge**